IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

April 8, 2026 Session Heard at Memphis[1]

## STATE OF TENNESSEE v. NAKEAVIOUS MILAN

**Appeal from the Criminal Court for Shelby County**
No. 23-03885     Carolyn W. Blackett, Judge

———————————————————

### No. W2025-01345-CCA-R3-CD

———————————————————

The Defendant, Nakeavious Milan, entered a guilty plea to one count of voluntary manslaughter, a Class C felony. See Tenn. Code Ann. § 39-13-211 (Supp. 2022). Pursuant to his plea agreement, the Defendant was sentenced as a Range II, multiple offender to eight years, with the trial court to determine whether the Defendant would be permitted to serve his sentence on probation. Following a sentencing hearing, the trial court denied the Defendant's request for full probation and ordered him to serve his eight-year sentence in confinement. On appeal, the Defendant argues that the trial court abused its discretion in denying his request for full probation. After review, we affirm the judgment of the trial court.

**Tenn R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, P.J., and JOHN W. CAMPBELL, SR., J., joined.

Katherine Oberembt, Memphis, Tennessee, for the appellant, Nakeavious Milan.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Carrie Bush, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Defendant's conviction resulted from his criminal conduct on February 4, 2023, when he fatally shot Adrian Milan, his uncle and the victim in this case. The Defendant was subsequently indicted by the Shelby County Grand Jury for one count of first degree premeditated murder.

—————————

[1] Oral argument in this case was heard at the Cecil C. Humphreys School of Law at the University of Memphis.

At the plea submission hearing, the State presenting the following facts to support the Defendant's guilty plea to voluntary manslaughter:

[O]n or about Saturday, February 4[], 2023, officers responded to a shooting in the 3500 block of Kruger Road. Upon their arrival, they located the victim, Adrian Milan, l[y]ing in the middle of the street suffering from what appeared to be gunshot wounds. [The f]ire department made the scene and pronounced the victim deceased. There was a witness Ms. C[hasity] Booker[,] who advised that she was in the vehicle with [the victim] when the victim drove down Kruger Road and saw [the Defendant's] vehicle backed into the driveway. The victim stopped and exited the vehicle, approached the [D]efendant's vehicle, and the witness advised [that] soon after she observed fire sparks coming from inside the [D]efendant's vehicle and she heard several gunshots. She then saw the victim run to the front of the [D]efendant's vehicle and fall in front of the headlights. She observed [the Defendant] stand over the victim and continue to shoot him. The witness stated that that's when she jumped in the driver's seat and speed off. She did identify [the Defendant] in a photo lineup as the person she saw shoot and kill [the victim]. . . . The relationship between the victim and the [D]efendant is . . . uncle and nephew[.]

The Defendant stipulated that there was a factual basis for his plea. In addition, during questioning from the trial court, he acknowledged that the facts, as stated in the record, were true and that he was pleading guilty to those facts. Pursuant to his plea agreement, the Defendant entered a guilty plea to the lesser included offense of voluntary manslaughter in exchange for a sentence of eight years at 100% as a Range II, multiple offender, which was out of range for him. As a part of this agreement, the Defendant was permitted to petition the court for probation. At the conclusion of the plea submission hearing, the trial court accepted the Defendant's guilty plea. Prior to his sentencing hearing, the Defendant filed a Notice of Mitigating Factors, claiming that he acted under strong provocation; that substantial grounds existed tending to excuse or justify his criminal conduct, though failing to establish a defense; that because of youth, he lacked substantial judgment in committing the offense; that although he was guilty of the crime, he committed the offense under such unusual circumstances that it was unlikely that a sustained intent to violate the law motivated his conduct; and that there were other factors consistent with the purposes of Title 40, chapter 35.

At the ensuing sentencing hearing, the State entered the presentence report, and the defense entered a sentencing memorandum. Captain Michelle Hunt, a corrections officer at the Shelby County jail, testified that the Defendant, while incarcerated, participated in

several programs provided by the jail, including a book club, religious services, the Memphis Allies program, and the First Time Felonies Program. She said the Defendant had no disciplinary infractions at the jail, had been given a job cleaning the administrative portions of the jail, and had a good relationship with the other jail administrators. Captain Hunt asserted that she had "briefly" spoken with the Defendant about the facts of the offense. She indicated that the Defendant had "tak[en] ownership of what happened" and knew that "what he did was wrong." She stated that she would not come to testify for just anyone, and she opined that the Defendant could be successful if placed on supervised probation.

The Defendant testified on his own behalf, stating that although he was currently twenty-two years old, he had been nineteen years old at the time of the offense in this case. He said he had graduated from high school, had worked at Amazon, Southern Steel, and Memo, and had taken welding classes at Tennessee Tech. He stated that he was close with his immediate family but acknowledged that there were "arguments and aggression" and "a lot of drama" between individual family members. He also noted there was some physical violence and some use of weapons between members of his extended family.

The Defendant acknowledged that the victim in this case was his uncle and that he and his uncle did not have a close relationship because his uncle had been incarcerated for a violent crime during the Defendant's youth. The Defendant also said his uncle had a reputation for violence and had some mental health issues.

The Defendant stated that in the month prior to the victim's shooting, the victim and his mother had been arguing, but he did not know why they were arguing and did not personally witness an incident in which the victim allegedly robbed his mother and her boyfriend. However, the Defendant did witness a different incident in which the victim pulled up his car, pointed a gun at the Defendant's mother, and threatened to kill her if she did not pay him $7,000. The Defendant told his grandmother what he observed, and his grandmother said she would call the victim's probation officer and "put an end[] to it," although he was unsure what happened after that. He acknowledged that he did not report the incident involving his mother and the victim to the police.

Regarding the instant offense, the Defendant stated that on February 4, 2023, he was on Kruger Street in North Memphis and was sitting in the driver's seat of his godfather's truck. He said he was backed into the driveway of a home when the victim pulled up in his vehicle and blocked the Defendant's truck in the driveway. At the time, the victim's girlfriend, Chasity Booker, was also inside the victim's car. The Defendant said the victim "hopped out of the car with a gun[,]" ran up to the driver's side window of his vehicle, and "rais[ed] his hand" and had his "finger on the trigger." The Defendant said he "feared for [his] life," which was why he grabbed his gun and fired "eight times" in quick succession

- 3 -

out the open window his vehicle. He denied that the victim said anything as he approached him. The Defendant stated that he "was scared" and knew something was "wrong." He explained that he had a gun for protection because a few months earlier someone had been jumping out of a car and shooting people in this neighborhood. Proof showed that the victim had a gun that was recovered from the crime scene.

The Defendant acknowledged that although Chasity Booker claimed he had gotten out of the truck, stood over the victim, and fired shots into the victim while the victim was lying on the ground, the Defendant denied taking these actions. Instead, he asserted that he fired shots from the driver's seat of his truck. He said that after firing these shots, he "was so scared" and "didn't know what to do," so he "pulled off" and drove away. He claimed Chasity then "jumped into the . . . driver's seat" of the victim's car and "pulled off as well."

The Defendant asserted that although he could have argued at trial that he shot the victim in self-defense, he did not want to do that because his grandmother and family had lost the victim, who was a member of the family, and he felt like he needed take responsibility for his actions. The Defendant said he was "very remorseful" and "sorry" for the things he did. He stated that he wished he had stayed on the scene and called the police so that he could have gotten the victim some help. He acknowledged that he did not call 9-1-1 immediately after the shooting because he "was scared" and "knew that [he] would have to go to jail." He said that although he left the scene, he turned himself into the police a couple of weeks later.

The Defendant acknowledged that the autopsy report showed that the victim may have been run over at some point. Although he did not recall running over the victim as he left, he acknowledged it was possible that he had run him over, which made him look bad and was difficult for his family to hear.

The Defendant stated that during his time in custody, he had been "attending programs, working a lot, [and] helping brothers around [him]." He also had gotten involved in the Memphis Allies Program, which has "kept him productive" and kept him "strong" during his case. He stated that he would continue to participate in the Memphis Allies Program if granted probation, which would assign him a "life coach," "case manager," and "clinical specialist" to help him. The Defendant also stated that he was involved in the First Time Felonies Program, recommended to him by Lieutenant Williams, which helped guide individuals upon their release from prison. The Defendant said that if the court granted him probation, he would live with his aunt, who was removed from some of the family drama, and that he would work and save money so he could pursue his welding certifications. He said his long-range career goal was to become an aircraft mechanic.

The Defendant maintained that he was capable of following all rules associated with probation. He apologized to his grandmother and his family for the pain he caused them. He added, "I'm very remorseful, and if I'm given this second chance, I promise to make the best of it. I love y'all, and I wish it didn't have to be like this."

On cross-examination, the Defendant asserted that Chasity Booker was not telling the truth when she claimed she saw him walk around the front of his truck and stand over the victim while shooting him. He acknowledged that the problem with his version of the facts was that the victim had both entrance wounds and exit wounds on the front of his body. Nevertheless, he denied standing over the victim while firing his shots. The Defendant also admitted that the victim had sustained gunshot wounds to his lower legs, which made it difficult to believe that he had only fired shots from his truck. When the trial court asked some follow-up questions, the Defendant explained that when the victim approached his truck, he fired shots from his vehicle, and when the victim turned and ultimately fell down, some of his bullets went through the victim's back. He admitted that he continued to fire shots at the victim after he had fallen to the ground, even though the victim was no longer a threat to him.

The Defendant acknowledged that this was not the first time the police had caught him with a gun because he had also been arrested as a juvenile for having a gun. He admitted he previously had been granted probation, which did not rehabilitate him because he continued to possess a gun on the streets. In addition, the Defendant also admitted he had been involved in an unrelated offense, that the State ultimately dismissed, where one of his friends died in a car wreck while he was driving during a shootout; he acknowledged that he also had a gun during that incident. The Defendant asserted that the car wreck incident occurred because of the people in his environment; however, he admitted that when he had been given the opportunity to receive an alternative sentence and be out in the community, he had made several bad decisions. He also admitted that Memphis was a very dangerous place, in part because too many people had guns and were willing to use them. The Defendant acknowledged that he had already served two years for the voluntary manslaughter offense and would be required to serve six more years before his release under the agreed upon eight-year sentence.

On redirect examination, the Defendant denied ever standing over the victim and shooting him; instead, he admitted to shooting the victim several times from his car, which was why he entered his guilty plea. The Defendant acknowledged that he received two different juvenile adjudications for misdemeanor offenses. He said the first juvenile adjudication occurred when he was approximately fifteen years old, and he received judicial diversion for his unlawful possession of a weapon and evading arrest. He said the second juvenile adjudication occurred when he was fifteen or sixteen years old, and he was

put on probation for obstructing a highway passageway and for his unlawful possession of a weapon.

Quinthia Milan, the Defendant's aunt, testified that if the Defendant were placed on probation, he would be living with her. She stated that she and her nineteen-year-old son kept to themselves because her family was "a bit dysfunctional" and no one did "anything productive." She also observed that there was no one to raise the Defendant because his mother was sick with leukemia and there was no one to supervise him. She confirmed that she could provide a safe environment for the Defendant.

Cosandra Milan, the victim's mother and the Defendant's grandmother, testified about the enormous impact the victim's death had on her and her family. When the State asked if she had an opinion about whether the Defendant should receive probation, Ms. Milan replied, "I think [the court] should, because anything we do here today is not going to bring my child back . . . . At the end of the day, this is my child[] and my grandchild[], and I don't know how to feel."

The trial court made it clear to Ms. Milan that regardless of whether it granted probation, the Defendant would be out of prison in a few years. The court added, "So he's going to be back into that family whether it's dysfunctional or not, whether you and your [daughter] get along or not, but the sad part about it is you will always remember your [son]." When the trial court asked Ms. Milan how it could help her deal with the situation, Ms. Milan responded:

> I just—I don't know. I just try to find a way to cope. I've got—I have to get counseling myself. It's just—we got to find a way to find each other, because there's nothing going to ever bring [my son] back and I understand that. I love my grandson, and I love my daughter, which is his mother. I don't know. We just need help, and I think in time—it took a while for me to love my daughter, because I resented my daughter for what her son did, but all of us was raised in the house together so I—I don't know.

The trial court said that it would consider all the evidence and issue a written order regarding the issue of probation.

On August 6, 2025, the trial court entered a written order. In it, the court recognized that the Defendant's request for probation should be considered "in light of both the gravity of the offense and his potential for rehabilitation." Initially, it observed that the Defendant's plea agreement "significantly reduced his exposure by modifying the original charge of first-degree murder to voluntary manslaughter" and that while this reduction was "lawful and negotiated," it did "not negate the factual record established at the sentencing

hearing" and did "not diminish the evidence presented." The trial court then made the following findings regarding the circumstances of the Defendant's offense:

> During a confrontation with his uncle, the Defendant discharged multiple rounds, including shots that were fired after the decedent had begun to turn away. An eyewitness testified that the Defendant stood over the victim and continued to fire rounds while he was on the ground. Furthermore, the Defendant admitted that it was possible that some shots struck the victim in the back and that he may have run over the victim while fleeing the scene.

Regarding the Defendant's criminal record, the trial court acknowledged that the Defendant had no adult felony convictions but considered the Defendant's prior juvenile adjudication for unlawful possession of a weapon and evading arrest, for which he received judicial diversion. The court concluded that "this history, coupled with the facts surrounding the current offense, suggests that the Defendant poses a high risk of future criminal conduct."

The trial court recognized that the Defendant presented favorable proof regarding his "institutional conduct, educational accomplishments, and future aspirations" as well as evidence that the Defendant "graduated from high school, maintained employment at Amazon, Southern Steel, and Memo, enrolled in vocational training at Tennessee Tech in 2022, and participated in rehabilitation programs such as Memphis Allies and the First Time Felonies Program while incarcerated." Nevertheless, the court held that these "positive efforts" had to be "weighed against the seriousness of the offense and the Defendant's credibility." Although the court acknowledged that the Defendant had "expressed remorse," it also found that the Defendant's "account of events was contradicted by physical evidence and eyewitness testimony." The court observed that it was "not obligated to credit expressions of remorse when they lack candor or appear self-serving."

Lastly, the trial court noted that "[t]he law allows [for] the denial of probation when necessary to prevent the offense from being perceived as less serious or to deter others" and concluded that both rationales applied to the Defendant's case. The court held that "[g]ranting probation [in this case] would minimize the significance of using lethal force against a retreating family member and could erode public trust in the judicial system." The court also found that the Defendant's grandmother was "still processing the death of her son[, the victim,] and d[id] not appear ready for her grandson's release." The trial court concluded that the Defendant had "not met his burden" of demonstrating that "probation would serve the interests of justice and the public." Ultimately, the trial court held that "full probation [was] not appropriate" in this case.

Following entry of the judgment of conviction, the Defendant timely filed a notice of appeal.

## ANALYSIS

The Defendant argues on appeal that the trial court abused its discretion in denying his request for probation. Specifically, he contends that the trial court erred in: (1) relying on facts outside the record, specifically the court's opinion that the Defendant's grandmother was not psychologically ready for the Defendant's release, in denying probation; (2) holding that the seriousness of the offense justified the denial of probation; (3) concluding that the need for deterrence justified the denial of probation; (4) finding that the Defendant posed a "high risk of future criminal conduct" because of his juvenile misdemeanor adjudication; (5) determining that the Defendant's testimony lacked credibility when his testimony was not disputed by any proof or information in the record; and (6) failing to consider the statutory mitigating factors he submitted. The State responds that the trial court acted within its discretion in denying the Defendant a probationary sentence. We agree with the State.

The 2005 amendments to the sentencing act "served to increase the discretionary authority of trial courts in sentencing." State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). Accordingly, this court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707. This abuse of discretion standard of review, accompanied by a presumption of reasonableness, also applies to a trial court's decision regarding "probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012).

Pursuant to the 2005 amendments to the sentencing act, a trial court must consider the following when determining whether to impose an alternative sentence:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee;

(7)     Any statement the defendant wishes to make on the defendant's own behalf about sentencing; and

(8)     The result of the validated risk and needs assessment conducted by the department and contained in the presentence report.

Tenn. Code Ann. § 40-35-210(b).   The defendant has the burden of showing the impropriety of the sentence on appeal.   Id. § 40-35-401(d), Sentencing Comm'n Comments.   In determining the proper sentence, the trial court must consider the defendant's potential for rehabilitation or treatment.   Id. §§ 40-35-102(3)(C), -103(5).   In addition, the court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed."   Id. §§ 40-35-103(2), (4).

Any sentence that does not involve complete confinement is an alternative sentence. See generally State v. Fields, 40 S.W.3d 435 (Tenn. 2001).   Tennessee Code Annotated section 40-35-102(6)(A) states that a defendant who does not require confinement under subsection (5) and "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary[.]"   However, a trial court "shall consider, but is not bound by, the advisory sentencing guideline" in section 40-35-102(6)(A).   Tenn. Code Ann. § 40-35-102(6)(D).   Here, the Defendant was not considered a favorable candidate for alternative sentencing because he was a Range II, multiple offender and because he had pled guilty to a Class C felony.   See id. 40-35-102(6)(A).

A trial court's determination of whether the defendant is entitled to an alternative sentence and whether the defendant is a suitable candidate for full probation are different inquiries with different burdens of proof.   State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996).   The defendant has the burden of establishing suitability for full probation, even if the defendant is considered a favorable candidate for alternative sentencing.   Id. (citing Tenn. Code Ann. § 40-35-303(b)).   A defendant is eligible for probation if the actual sentence imposed upon the defendant is ten years or less and the offense for which the defendant is sentenced is not specifically excluded by statute.   Tenn. Code Ann. § 40-35-303(a) (Supp. 2022).

While the trial court is required to consider probation as an alternative sentence for eligible defendants, an eligible defendant is not automatically entitled to probation as a matter of law.   State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997).   Instead, a defendant must show that probation will "'subserve the ends of justice and the best interests of both the public and the defendant.'"   State v. Carter, 254 S.W.3d 335, 347 (Tenn. 2008) (quoting State v. Housewright, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)).   In determining whether a defendant is a suitable candidate for probation, the trial court should consider

"(1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; and (6) special and general deterrence value." State v. Trent, 533 S.W.3d 282, 291 (Tenn. 2017).

In addition, when determining whether to deny alternative sentencing and impose a sentence of total confinement, the trial court must consider if:

(A)   Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B)   Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C)   Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn. Code Ann. § 40-35-103(1); see State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). Tennessee Code Annotated section 40-35-102(5) gives courts guidance regarding the types of defendants who should be required to serve their sentences in confinement:

In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration[.]

First, the Defendant argues that the trial court relied on facts outside the record to deny probation, namely the court's opinion that the Defendant's grandmother, Cosandra Milan, was not psychologically ready for the Defendant's release. He claims that although Ms. Milan explicitly testified that she wanted the Defendant to be granted probation, the trial court relied on its "subjective impression" that Ms. Milan was "still processing the death of her son and d[id] not appear ready for her grandson's release." He asserts that because the trial court's "extrajudicial observations regarding Ms. Milan's psychological state [are] not a relevant sentencing factor," these observations are "not a proper basis for sentencing." The Defendant then argues that the trial court's "undue consideration of an irrelevant sentencing factor amounts to an abuse of discretion[,]" which "warrants either de novo review or remand to the trial court for reconsideration." As support for this claim, the Defendant argues that a trial court cannot "'assume facts not in the record, based a sentence on extraneous facts, or take judicial notice of facts'" not included in the record on appeal. State v. Ward, No. E2018-01781-CCA-R3-CD, 2019 WL 3244991, at *10 (Tenn.

Crim. App. July 19, 1999) (quoting State v. Nunley, 22 S.W.3d 282, 287 (Tenn. Crim. App. 1999)).

We agree that a trial court is precluded from assuming facts not in evidence, basing a sentence on extraneous facts, or taking judicial notice of facts that are not available to this court or are not included in the appellate record. Nunley, 22 S.W.3d at 287. This rule exists because "[a] trial court's extrajudicial observations are not the proper basis for sentencing." State v. Carr, No. M2002-02261-CCA-R3-CD, 2003 WL 1018142, at *4 (Tenn. Crim. App. Mar. 11, 2003) (citing State v. Hooper, 29 S.W.3d 1, 13 (Tenn. 2000); Tenn. Code Ann. § 40-35-210(g)). "In other words, '[i]t matters not what is known to the judge personally if it is not known to him in his official capacity.'" Vaughn v. Shelby Williams of Tennessee, Inc., 813 S.W.2d 132, 133 (Tenn. 1991) (quoting Galbreath v. Nolan, 429 S.W.2d 447, 450 (Tenn. Ct. App. 1967)).

A trial court's reliance on facts outside the record may constitute reversible error. See State v. Brooks, No. W2015-00833-CCA-R3-CD, 2017 WL 758519, at *16 (Tenn. Crim. App. Feb. 27, 2017) ("Based on the trial court's impermissible and heavy reliance on facts not in evidence, we conclude that the trial court abused its discretion, as the record lacks any substantial evidence to support its findings."); see also Vaughn, 813 S.W.2d at 133-34 (concluding that the trial court's "personal observations of the Plaintiff prior to trial, separate and apart from any judicial proceedings" played a significant role in its exercise of judicial discretion and warranted reversal) (emphasis added).

In determining whether such an error requires reversal, we must examine whether "the trial court's personal observations played a significant role in the exercise of judicial discretion." Vaughn, 813 S.W.2d at 134. Reversal is not warranted when the trial court considers facts in the record and the statutory criteria and when its decision is "consistent with the purposes and principles of sentencing." Ward, 2019 WL 3244991, at *11 (quoting State v. Sihapanya, 516 S.W.3d 473, 476 (Tenn. 2014)).

The record shows the trial court questioned Cosandra Milan at length regarding whether she felt the Defendant should be given probation. Although Ms. Milan stated that she wanted the Defendant to receive probation, it was apparent that she was devastated by the fact that her grandson killed her son. Ms. Milan seemed genuinely at a loss about how her family could recover from this, and she acknowledged that the passage of time had allowed her to forgive her daughter for the Defendant's actions. Based on the record, the trial court was well within its discretion in finding that Ms. Milan was "still processing the death of her son and d[id] not appear ready for her grandson's release." The court's finding was not based on facts outside the record; instead, it was based on the specific responses that Cosandra Milan provided at the sentencing hearing. See Tenn. Code Ann. § 40-35-210(b)(1) (stating that a trial court must consider "[t]he evidence, if any, received at the

- 11 -

trial and the sentencing hearing" when determining whether to impose an alternative sentence); State v. Raines, 882 S.W.2d 376, 383 (Tenn. Crim. App. 1994) (noting that "[t]he trial court, as the trier of fact at sentencing hearings, has the opportunity to observe the manner and the demeanor of the witnesses" and holding that the appellate court "will not interfere with the trial court's findings of fact in this regard unless the evidence contained in the record clearly preponderates against these findings"). Even if we were to conclude the evidence in the record preponderated against the trial court's finding that Ms. Milan was not ready for her grandson's immediate release on probation, the trial court filed a lengthy written order explaining its denial of probation, relying on the facts in evidence and fully considering the purposes and principles of sentencing. Specifically, the trial court relied on the gravity of the offense; the Defendant's criminal record, which consisted of two juvenile adjudications, the Defendant's high risk of future criminal conduct, and the Defendant's lack of credibility. The trial court also concluded that confinement was necessary to avoid depreciating the seriousness of the offense and that confinement was particularly suited to provide an effective deterrence to others likely to commit similar offenses. Because the trial court based its decision to deny probation on the statutory criteria, the evidence in the record, and the purposes and principles of sentencing, the Defendant is not entitled to relief on this claim.

Second, the Defendant argues that the trial court erroneously relied on the seriousness of the offense to justify the denial of probation. See State v. Trotter, 201 S.W.3d 651, 654 (Tenn. 2006) (stating that when the seriousness of the offense forms the sole basis for denying an alternative sentence, a heightened standard applies, meaning that the trial court must make additional findings showing that "'the circumstances of the offense as committed must be especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree,' and the nature of the offense must outweigh all factors favoring a sentence other than confinement" (quoting State v. Grissom, 956 S.W.2d 514, 520 (Tenn. Crim. App. 1997)); State v. Butler, 880 S.W.2d 395, 400-01 (Tenn. Crim. App. 1994) ("[T]he fact that the death of another results from the defendant's conduct does not, alone, make the offense sufficiently violent to justify a denial of probation nor can it be viewed as sufficient evidence to overcome the presumption in T.C.A. § 40-35-102(6)."). The Defendant contends that because the trial court's reasons for denying probation, other than the seriousness of the offense, were "erroneous or not supported by evidence in the record," this court should apply the heightened standard of review in Trotter. We disagree.

This court explained the circumstances in which additional findings associated with this heightened standard of review are required:

> [U]nder Hooper and Trotter, if only one factor found in Tennessee Code Annotated section 40-35-103(1) is utilized by the trial court, the trial court

- 12 -

must make additional findings. If, however, the trial court bases the denial of alternative sentencing on more than one factor, we review the denial to determine if the trial court abused its discretion.

State v. Lester, No. M2014-00225-CCA-R3-CD, 2014 WL 5501236, at *5 (Tenn. Crim. App. Oct. 31, 2014); see State v. Dunnivant, No. E2023-01652-CCA-R3-CD, 2024 WL 4579325, at *6 (Tenn. Crim. App. Oct. 25, 2024) (collecting cases). Often, the combination of factors involves the remaining considerations in Code section 40-35-103(1); however, the same rule applies when the trial court's denial of probation relies on additional considerations within Code section 40-35-103. See Dunnivant, 2024 WL 4579325, at *6; see also State v. White-McCray, No. E2020-01735-CCA-R3-CD, 2022 WL 2801005, at *5 (Tenn. Crim. App. July 18, 2022); State v. O'Brien, No. E2014-02248-CCA-R3-CD, 2015 WL 5179190, at *4 (Tenn. Crim. App. Sept. 4, 2015).

In the Defendant's case, the trial court relied on several considerations in denying probation for the Defendant's voluntary manslaughter conviction. In its written order, the court noted that "[t]he law allows [for] the denial of probation when necessary to prevent the offense from being perceived as less serious or to deter others," see Tenn. Code Ann. § 40-35-103(1)(B), and determined that both of these rationales applied to the Defendant's case. Accordingly, the court relied on both considerations in Code section 40-35-103(1)(B) in denying full probation to the Defendant. See Lester, 2014 WL 5501236, at *5. The trial court also relied on the Defendant's lack of potential for rehabilitation in denying probation. See Tenn. Code Ann. § 40-35-103(5) ("The potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed."). Because the trial court's denial of full probation relied on a mixture of valid considerations, we conclude that the heightened standard of review required by Trotter does not apply.

Third, the Defendant contends that the trial court erroneously relied on the need for deterrence to justify the denial of probation. See Hooper, 29 S.W.3d at 9 (stating that when deterrence serves as the only reason for confinement, "the record must contain some proof of the need for deterrence before a defendant, who is otherwise eligible for probation or other alternative sentence, may be incarcerated"). He claims because the trial court's remaining reasons for denying probation, other than the need for deterrence, were either "erroneous or not supported by the record," this court should apply the heightened standard of review in Hooper. Again, we disagree.

As we previously noted, the trial court relied on both considerations in Code section 40-35-103(1)(B) in denying full probation for the Defendant. See Lester, 2014 WL 5501236, at *5. Moreover, the trial court relied on the Defendant's lack of potential for rehabilitation in denying probation. See Tenn. Code Ann. § 40-35-103(5). Given that the

- 13 -

trial court's denial of full probation relied on this combination of considerations, the heightened standard of review required by Hooper does not apply.

Fourth, the Defendant asserted that the trial court erred in finding that the Defendant posed a "high risk of future criminal conduct" because of his juvenile misdemeanor adjudication for unlawful possession of a weapon and evading arrest. The Defendant concedes that the trial court could have found that measures less restrictive than confinement had been frequently or recently applied to the Defendant, given these two different juvenile adjudications. See id. § 40-35-103(1)(C). However, he claims the evidence in the record did not support the trial court's determination that the Defendant's juvenile adjudication for unlawful possession of a weapon and evading arrest established that the Defendant posed a high risk of future criminal conduct.

We agree that the trial court could have used the Defendant's juvenile adjudications to apply Code section § 40-35-103(1)(C), and we conclude that the applicability of subsection (C), along with the trial court's other findings, fully supports the denial of probation in this case. We also note that in all sentencing determinations, including probation, the trial court must consider the defendant's potential for rehabilitation or treatment. Id. §§ 40-35-102(3)(C), -103(5). Certainly, as a part of this determination, the trial court was free to consider the Defendant's two juvenile adjudications as evidence that he was at high risk to reoffend and, therefore, lacked potential for rehabilitation. Moreover, it was appropriate for the court to consider the Defendant's likelihood to reoffend when considering the Defendant's amenability to correction, the Defendant's criminal record, and the special deterrence value to this particular Defendant. See Trent, 533 S.W.3d at 291.

Fifth, the Defendant claims the trial court erroneously found, in its written order denying probation, that the Defendant's testimony lacked credibility because it was "contradicted by physical evidence and witness testimony." The trial court also specifically referenced the "questionable credibility" of his "self-defense claim" in concluding that probation was inappropriate. The Defendant asserts that witness Chasity Booker never testified at the sentencing hearing that the Defendant stood over the victim and shot him; instead, he claims the trial court merely relied on the State's recitation of the factual basis for his guilty plea and then erroneously attributed these facts to a testifying eyewitness.

The Defendant emphasizes that he testified at the sentencing hearing that he never stood over and shot at the victim while the victim was lying on the ground. He claims that because "no witness testified otherwise" and because "the only information to the contrary was limited to the stipulated factual basis" for his guilty plea, "it was error for the trial

- 14 -

court to find that [his] testimony lacked credibility, much less that his perceived lack of credibility reflected negatively on his potential for rehabilitation."

Here, the State referenced proof provided by Chasity Booker in its recitation of the factual basis supporting the Defendant's guilty plea. Despite the Defendant's claim, Booker was not required to testify at the sentencing hearing in order for the trial court to consider Booker's potential testimony regarding the Defendant's offense. In addition, the record fully supported the trial court's finding that the Defendant's testimony regarding the details of the offense was contradicted by physical evidence. At the sentencing hearing, the Defendant said the victim "hopped out of the car with a gun[,]" ran up to the driver's side window of his vehicle, and "rais[ed] his hand" and had his "finger on the trigger." The Defendant stated that because he "feared for [his] life," he grabbed his gun and fired "eight times" in quick succession out the open window his truck. The Defendant later acknowledged on cross-examination that the problem with his version of the offense was that the victim had both entrance wounds and exit wounds on the front of his body. The Defendant also admitted that the victim sustained gunshot wounds to his lower legs, which made it unlikely that the Defendant had only fired shots from his truck. When the trial court asked some follow-up questions, the Defendant stated that when the victim approached his truck, he fired shots from his vehicle, and when the victim turned and ultimately fell down, these bullets went through his back. He admitted that he continued to shoot after the victim had fallen to the ground, even though the victim was no longer a threat to him.

A trial court is free to consider a defendant's credibility in determining his amenability to correction. See State v. Zeolia, 928 S.W.2d 457, 463 (Tenn. Crim. App. 1996) ("[T]he appellant's credibility and willingness to accept responsibility for his crime are circumstances germane to his rehabilitation potential."); State v. Dowdy, 894 S.W.2d 301, 306 (Tenn. Crim. App. 1994) ("In considering false testimony of a defendant in the sentencing process, the trial court is therefore exercising its traditional discretion by evaluating the defendant's personality and prospects for rehabilitation."); see also Tenn. Code Ann. § 40-35-103(5). We agree that Booker's potential testimony and some of the physical evidence contradicted the Defendant's version of the offense. Accordingly, we conclude the trial court did not abuse its discretion in finding that this testimony and physical evidence indicated the Defendant was not credible.

Sixth, the Defendant claims the trial court erred in failing to consider the statutory mitigating factors submitted by him. He asserts that he filed a notice of mitigating factors and a sentencing memorandum, wherein he asked the trial court to consider several specific mitigating factors. The Defendant claims that because the trial court failed to consider the mitigating factors submitted by him, either orally or in its written ruling, the court's ruling

should not be accorded a presumption of reasonableness and should be either reversed and remanded for reconsideration or should be considered de novo by this court. We disagree.

In its written order, the trial court specifically recognized that the Defendant presented favorable proof regarding his "institutional conduct, educational accomplishments, and future aspirations" as well as evidence that the Defendant graduated from high school, maintained employment, enrolled in vocational training at Tennessee Tech, and participated in rehabilitation programs such as Memphis Allies and the First Time Felonies Program during his incarceration. However, the court appropriately determined that these "positive efforts" had to be "weighed against the seriousness of the offense and the Defendant's credibility." The court also acknowledged that the Defendant had "expressed remorse" but found that the Defendant's "account of events was contradicted by physical evidence and eyewitness testimony." The court recognized that it was "not obligated to credit expressions of remorse when they lack candor or appear self-serving." The trial court's lengthy findings show that it considered all the mitigating proof presented by the Defendant and weighed it when determining whether to grant full probation. See Bise, 380 S.W.3d at 706 ("[M]ere disagreement with the trial court's weighing of the properly assigned enhancement and mitigating factors is no longer a ground for appeal."). We conclude that the trial appropriately addressed the mitigating proof raised by the Defendant and provided abundant findings to support its denial of probation.

In this case, the record shows that confinement was necessary "to avoid depreciating the seriousness of the offense" and was "particularly suited to provide an effective deterrence to others likely to commit similar offenses." Tenn. Code Ann. § 40-35-103(1)(B). Although not specifically found by the trial court, the record also shows that measures less restrictive than confinement "ha[d] frequently or recently been applied unsuccessfully" to the Defendant. Id. § 40-35-103(1)(C). The Defendant received two juvenile adjudications involving the unlawful possession of a weapon, and his repeated propensity to go armed despite receiving these alternative sentences strongly suggests that the Defendant is not amenable to correction. Because the record shows that the trial court carefully considered the purposes and principles of sentencing before denying probation, the Defendant has failed "to either establish an abuse of discretion or otherwise overcome the presumption of reasonableness afforded" to the court's sentence in this case. Caudle, 388 S.W.3d at 280. Accordingly, we uphold the trial court's decision to deny probation to the Defendant.

## CONCLUSION

The judgment of the trial court is affirmed.

s/ **Camille R. McMullen**

CAMILLE R. MCMULLEN, JUDGE

- 16 -